1  Robert Ahdoot (SBN 172098)
2  rahdoot@ahdootwolfson.com
   Theodore W. Maya (SBN 223242)
3  tmaya@ahdootwolfson.com
4  Yufei Wang (SBN 346170)
   ywang@ahdootwolfson.com
5  **AHDOOT & WOLFSON, PC**
6  2600 West Olive Avenue, Suite 500
   Burbank, CA 91505
7  Telephone: (310) 474-9111
8  Facsimile: (310) 474-8585

9  Mark S. Reich*
10 mreich@zlk.com
   Christopher V. DeVivo*
11 cdevivo@zlk.com
   Michael N. Pollack*
12 mpollack@zlk.com
13 **LEVI & KORSINSKY, LLP**
14 33 Whitehall Street, 27th Floor
   New York, NY 10004
15 Telephone: (212) 363-7500
16 Facsimile: (212) 363-7171

17 *pro hac vice* forthcoming

18 *Attorneys for Plaintiffs and the Proposed Class*

19           **UNITED STATES DISTRICT COURT**

20          **CENTRAL DISTRICT OF CALIFORNIA**

21 ANDREW CHEUNG and NINA HARRIS,      Case No.
22 on Behalf of Themselves and All Others
   Similarly Situated,
23                                      **CLASS ACTION COMPLAINT**
24           Plaintiffs,
25 v.                                   **ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF**
26 SLICKDEALS, LLC
27           Defendant.                 **JURY TRIAL DEMANDED**
28

Plaintiffs Andrew Cheung and Nina Harris ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this class action complaint against Defendant Slickdeals, LLC ("Slickdeals" or "Defendant"). Slickdeals owns and manages a website located at https://www.slickdeals.net and https://www.slickdeals.com (collectively, the "Website"), which provides users with access to deal listings, promotional offers, product recommendations, discussion forums, and other consumer-focused content.

## NATURE OF THE ACTION

1.     Courts have recognized that opaque digital tracking practices threaten consumer privacy. The unauthorized collection of a person's browsing activity, website interactions, and device identifiers constitutes an invasion of a basic expectation of privacy in online activity.

2.     Defendant Slickdeals owns and operates the Website, which allows users to browse deal listings, promotional offers, product recommendations, and user-generated discussions concerning consumer goods and services.

3.     Defendant begins placing and transmitting third-party tracking technologies immediately upon a user's initial visit to the Website, before users receive any meaningful notice or opportunity to control the interception or dissemination of their data. Slickdeals transmits users' electronic communications and online activity to third-party advertising and analytics companies (the "Tracking Entities"), including Meta (also referred to as Facebook), Google, and Reddit, through cookies, pixels, and similar tracking tools (the "Tracking Tools"). These Tracking Tools enable Tracking Entities to monitor users' activity, including webpage browsing activity, views of specific products, and initiation of checkout to purchase products, across the Website in real time and the Tracking Tools associate that activity with persistent identifiers. These practices constitute an invasion of privacy, intrusion upon seclusion, and unlawful interception of electronic communications, and deprive users of control over their personal information, resulting in concrete injury sufficient to confer Article III standing.

CLASS ACTION COMPLAINT

4.      This tracking captures detailed interaction and behavioural data, including links, buttons, forms, and other on-page elements interacted with by users, as well as information entered into search fields. The data also includes routing and addressing information, including location information, IP addresses, and persistent identifiers used to identify the source of communications and the destination for the data. The Tracking Tools also capture and transmit device and technical identifiers such as device type, operating system, browser type, user identifiers that enable recognition across sessions and websites, and approximate geolocation data. The Tracking Entities use this data to infer users' interests, preferences, age, or other characteristics based on the users' behaviour on the Website. Collectively, this information is referred to herein as "Sensitive Information."

5.      Plaintiff Nina Harris visits the Website frequently, and visited the Website as recently as January 6, 2026. Plaintiff Harris used the Website to, among other things, browse deal listings, accept offers for discounted goods, and similar consumer activities. She makes purchases through the Website on a monthly basis, at a minimum. During those visits, Plaintiff Harris' communications with the Website—including her browsing activity and interactions—were intercepted by and transmitted to the Tracking Entities without her knowledge or consent. Plaintiff Harris did not authorize Slickdeals or any Tracking Entity to monitor, record, or disclose her website communications.

6.      Plaintiff Andrew Cheung visits the Website nearly daily. Plaintiff Cheung used the Website to, among other things, browse deal listings, accept offers for discounted goods, and similar consumer activities. He makes purchases through the Website several times a year, at a minimum, including pre-recorded video materials such as video games. During those visits, Plaintiff Cheung's communications with the Website—including his browsing activity and interactions—were intercepted by and transmitted to the Tracking Entities without his knowledge or consent. Plaintiff Cheung did not authorize Slickdeals or any Tracking Entity to monitor, record, or disclose his website communications.

CLASS ACTION COMPLAINT

7.     Defendant's conduct allowed the Tracking Entities to unlawfully intrude into Plaintiffs' Sensitive Information, private communications, invade Plaintiffs' fundamental right to privacy, and fraudulently misrepresented the Website's data-collection practices. In doing so, Defendant violated the Federal Wiretap Act, California's Invasion of Privacy Act ("CIPA"), including Penal Code § 631 (illegal wiretapping) and § 638.51 (unlawful use of a pen register or trap and trace device), and the Video Privacy Protection Act ("VPPA"); as well as common-law prohibitions against invasion of privacy, unjust enrichment, and related statutory and common-law protections. Plaintiffs bring this action on behalf of themselves and a class of similarly situated users harmed by Defendant's deceptive and unlawful surveillance practices.

8.     Federal and state legislatures have recognized and addressed individuals' privacy expectations in communications transmitted over wired and electronic systems.

9.     Congress enacted the Federal Wiretap Act to prohibit the unauthorized interception of electronic communications.

10.     California enacted the California Invasion of Privacy Act, which imposes civil liability on any person who, wilfully and without the consent of all parties to a communication, attempts to read or learn the contents or meaning of any message or communication while it is in transit or passing over any wire, line, or cable, or while it is being sent from or received at any place within California.[1]

11.     CIPA also prohibits the installation of a pen register or a trap and trace device without first obtaining a court order.[2]

12.     Defendant implemented and utilized the Tracking Tools to intercept, read, disclose, and record Users' Sensitive Information. The Website does not provide notice of, or obtain consent for, these practices.

13.     Users of the Website, including Plaintiffs, have an interest in maintaining control over their Sensitive Information and in preventing its misuse.

---

[1] Cal. Penal Code § 631(a).
[2] Cal. Penal Code § 638.51.

CLASS ACTION COMPLAINT

14.     Users of the Website have been harmed by Defendant's conduct, resulting in violations of the Federal Wiretap Act and CIPA. In addition to monetary damages, Plaintiffs seek injunctive relief requiring Defendant to either remove the Tracking Tools from the Website or obtain appropriate consent from Users.

15.     Plaintiffs' claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons. Plaintiffs seek relief in this action individually and on behalf of Users of the Website for violations of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e); violations of the Video Privacy Protection Act, 18 U.S.C. § 2710; Intrusion Upon Seclusion; violations of CIPA, Cal. Penal Code §§ 631 & 638; violations of the CLRA, Cal. Civ. Code §§ 1770 et seq.; violations of the UCL. Cal. Bus. & Prof. Code §§ 17200, et seq.; and Unjust Enrichment.

## PARTIES

16.     Plaintiff Nina Harris ("Plaintiff Harris") is, and at all relevant times was, a resident of California who accessed and used the Website to browse deal listings, promotional offers, and related consumer content from California. Through Defendant's placement of Tracking Tools on the Website, Plaintiff Harris's personal information, including browsing activity, page interactions, purchase activity, and device identifiers, was intercepted and transmitted as soon as Plaintiff Harris visited the Website. On one or more occasions, as recent as January 6, 2026, Plaintiff Harris's Sensitive Information was intercepted by and sent to Tracking Entities. Plaintiff Harris began receiving targeted or unsolicited advertisements related to the content and products viewed on the Website. Plaintiff Harris would not have accessed or used the Website had she known that her Sensitive Information would be intercepted and disclosed without her knowledge.

17.     Plaintiff Andrew Cheung ("Plaintiff Cheung") is, and at all relevant times was, a resident of Washington state who accessed and used the Website, to browse deal listings, promotional offers, and related consumer content from Washington state. Through Defendant's placement of Tracking Tools on the Website, Plaintiff Cheung's

personal information, including browsing activity, page interactions, purchase activity and device identifiers, was intercepted and transmitted as soon as Plaintiff Cheung visited the Website. Plaintiff Cheung has an account on the Website. Plaintiff Cheung purchased several video games through the Website, including Warhammer 40,000: Space Marine 2 on November 26, 2025, Helldivers II on November 24, 2025, Split Fiction on March 10, 2025, and Elden Ring on November 21, 2024. The Tracking Tools informed the Tracking Entities, including Facebook, each time Plaintiff Cheung purchased these video games, along with his personally identifying information. All four of these video games contain video cutscenes, which are pre-recoreded audio visual animations which provide narratives for the video game story. In short, Plaintiff Cheung's Sensitive Information, including audio visual material and personally identifiable information, was intercepted by and sent to Tracking Entities. Plaintiff Cheung began receiving targeted or unsolicited advertisements related to the content and products viewed on the Website. Plaintiff Cheung would not have accessed or used the Website had he known that his Sensitive Information would be intercepted and disclosed without his knowledge.

18.     Slickdeals, LLC is a Delaware limited liability company headquartered in Las Vegas, Nevada. Slickdeals owns and operates the website https://www.slickdeals.net and https://www.slickdeals.com, a popular deal-aggregation and consumer-discovery platform that allows users to browse, search for, and engage with curated and user-submitted deals, discounts, and promotions across a wide range of products and services. Slickdeals generates revenue by monetizing user engagement on the Website through advertising, affiliate marketing, analytics, and related data-driven technologies. In connection with these activities, Slickdeals deploys and permits third-party tracking technologies that collect, intercept, and transmit users' browsing activity, interactions, and device identifiers to advertising and analytics partners.

**JURISDICTION AND VENUE**

19.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class Member is a citizen of a state different from at least one Defendant. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Video Privacy Protection Act, 18 U.S.C. § 2710(b)(1) amd the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e).

20.    This Court has personal jurisdiction over Defendant because Defendant maintains a significant business presence and operation in the state, derives revenue in the State of California, including Defendant's revenue generated from its management over the Website, such as revenue sharing with retail partners, advertising sales, etc. that Defendant derives from the Website.

21.    Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant conducts substantial business operations in this District. In connection with the Website and the hosting of media accessible to Users, all claims originate and arise out of Defendant's business operations in this District. Lastly, the venue is proper in this District because Defendant is subject to this Court's personal jurisdiction with respect to this action.

**FACTUAL ALLEGATIONS**

I.    **How Websites Function**

22.    Websites are hosted on servers, in the sense that their files are stored on and accessed from publicly accessible servers, where the server may also run software to manage and monitor the website. However, websites are, in large part, "run" on a user's internet browser, as the browser loads and processes the webpage's code to display the webpage and run various code scripts that provide certain functionality to the website.

CLASS ACTION COMPLAINT

A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[3]

23.    Each webpage has a unique address in the forms of uniform resource locator (URL), internet protocol address (IP address), and path. Two webpages cannot be stored at the same address.[4]

24.    When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the URL), that user's browser contacts the DNS (Domain Name System) server, which translates the URL of that website into a unique IP (Internet Protocol) address.[5]

25.    An IP address is "a unique address that identifies a device on the internet or a local network."[6] Essentially, an IP address is:

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works. Id.

26.    When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the webpage's URL. If the server fulfils this request, it issues an HTTP response (the "HTTP Response"), which includes the status of the request and, typically, the requested content. This content is then transmitted in small

---

[3] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Jan. 6, 2026).
[4] *Id.*
[5] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Jan. 6, 2026).
[6] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Jan. 6, 2026).

CLASS ACTION COMPLAINT

chunks, known as data packets, and reassembled into the complete webpage upon arrival by the user's browser.[7]

27.   This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

28.   The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[8] as depicted below:



*Figure 1 – Mozilla's diagram of a URL, including parameters[9]*

29.   Website owners or web developers write and manage the URLs for their websites.

30.   URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[10] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

---

[7] *Id.*
[8] To see examples of how Defendant used parameters to provide additional information here, *see infra,* Section C(2).
[9] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Jan. 6, 2026).
[10] *Id.*

31.   The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[11] Today, UTF-8 is the Internet's most common character encoding.[12]

32.   URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[13] To demonstrate:



*Figure 21 – Demonstrating URL encoding and decoding[14]*

33.   Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.

---

[11]   *HTML ASCII Reference*, w3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited Jan. 6, 2026).

[12]   *UFT-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Jan. 6, 2026).

[13]   *What IS URL Decoding and URL Encoding?*, GOCHYU (Oct. 18, 2020), https://gochyu.com/blog/url-encode-decode (last visited Jan. 6, 2026).

[14]   Viraj Shetty, *URL Encoding in a few minutes*, YOUTUBE (Sept. 5, 2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited Jan. 6, 2026).

CLASS ACTION COMPLAINT



*Figure 32 – Sample webpage used to demonstrate a webpage URL*



*Figure 43 – Request URL of sample webpage from Figure 3, encoded for transmission (compare with decoded URL in Figure 4)*

*Figure 54 – Decoded, parsed data from Request URL in Figure 11, showing easy-to-read parameters and metadata*

34.    After sending the Request URL, the server sends the HTTP Response to the user, and browser assembles the response packets sent by the server back into the HTML code of the webpage. The webpage code is then processed by the user's browser and "rendered" into a visual display according to the instructions of the webpage's source code, including HTML, CSS, and JavaScript code.[15] This is the visible, and usually interactable, website that appears on users' monitors.

35.    To provide more complex website functionalities, website developers will include more complex commands written in non-HTML programming languages such as JavaScript snippets, which are embedded or called within the HTML code.[16]

36.    Such complex tasks include order forms and inventory management, or code used to monitor and report user activity.

---

[15] *How the web works?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Jan. 9, 2025).

[16] *See JavaScript Basics*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Jan. 6, 2026).

CLASS ACTION COMPLAINT

37.    In short, the Internet relies on a constant back and forth stream of requests to modify webpage content, navigate to new webpages, make internet purchases, or otherwise generally browse websites.

38.    Unbeknownst to users, as they browse and use the Website, the Tracking Tools capture and record both incoming and outgoing requests that make up users' communications with the Website.

**A.    Defendant's Use of Tracking Tools Allows Tracking Entities to Spy on Users, Including Plaintiffs.**

39.    Defendant operates the Website and has installed the Tracking Tools. These Tracking Tools operate invisibly, tracking Defendant's site visitors' activity surreptitiously.

40.    Generally, the Tracking Tools collect information about users' site activity when events specified by Defendant—like searching for a product or checking out to purchase a product—are triggered. The Tracking Tools associate this information back to the website operators that installed the Tracking Tools via some identification number, such as a Pixel ID.[17]

41.    Parameters added to events by Defendant determine just how much data is collected, and how specific that data is.

---

[17] *See generally Get Started*, META, https://developers.facebook.com/docs/meta-pixel/get-started/ (Dec. 24, 2025) (noting that the Pixel ID is part of the base code, which will result in the "download" of "a library of functions" related to that Pixel ID used "for conversion tracking"); *Conversion Tracking for Websites*, X Business, *How to create and access TikTok Pixel ID*, TikTok, https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites (instructing users that they must insert their pixel ID into the base code for operation tracking); https://ads.tiktok.com/help/article/how-to-create-and-access-tiktok-pixel-id?lang=en (last visited Jan. 6, 2026) (instructing users to create Pixel ID to setup and link data tracking).

42.    Parameters are strings of text that website owners add to a URL to track and organize their webpages.[18] URL parameters include key-value pairs formatted as "key=value":

      1.    The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event)

      2.    The "value" is the specific setting or data for that parameter (e.g., "yellow" or "AddToCart" for a user taking the action of adding a product to their online shopping cart)



*Figure 6 - Diagram of a URL displaying how parameters function[19]*

43.    For instance, the Facebook Pixel (discussed and defined herein) transmission below shows that Defendant added a parameter to track events being triggered ("ev") and the event triggered here was the "ViewContent" event, among other parameters.

---

[18] *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (Mar. 13, 2025), https://backlinko.com/url-parameters (last visited Jan. 6, 2026).
[19] *Id.*

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12  *Figure 7 - Facebook Pixel transmission displaying event parameter being collected and*

13  *disclosed to Facebook*

14      44.     An image of the homepage of the website and sample product can be seen

15  here:

16



17

18

19

20

21

22

23

24

25

26

27  *Figure 8 – Home page of Website*

28

CLASS ACTION COMPLAINT



*Figure 9 – Sample product on the Website*

### 1.    The Facebook Pixel

45.    Facebook offers its own tracking pixel (the "Facebook Pixel") to website owners for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

46.    The Facebook Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook account with its Pixel, and then add code to the website to make use of the Pixel.[20]

47.    Upon creating a Pixel, a Pixel ID (also called a DataSet ID by Meta), is generated.[21] This Pixel ID is used to initialize the Pixel, either by allowing Meta to fetch

---

[20]    *Set up and install the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Jan. 6, 2026).

[21] *Id.*

CLASS ACTION COMPLAINT

a pre-determined library of code related to that ID, or otherwise by identifying the website owner's Facebook account used receive the collected data when programming the Pixel directly into a website.[22]

48.    This Pixel ID must match "a known Pixel ID" in Meta's system,[23] and is transmitted by the Meta Pixel.[24]

49.    As Facebook notes, the Pixel must be added to each individual page that a website owner wishes to be tracked.[25]

50.    Once added to a webpage, the Pixel begins intercepting information as soon as a user visits the webpage and the Pixel loads onto the user's browser.[26]

51.    The Pixel is employed by Defendant to gather, collect, and then share user information with Facebook.[27] Receiving this information enables Facebook and Defendant to build valuable personal profiles for Website users to inform its targeted

---

[22] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Jan. 6, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[23] *Pixel Helper*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/support/pixel-helper (last visited Jan. 6, 2026).

[24] *Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Jan. 6, 2026).

[25] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Jan. 6, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[26] *See* Mario Neto, *What is the Facebook Pixel – Different ways to collect data to boost your ads performance*, BIRCH BLOG (May 13, 2025), https://bir.ch/blog/what-is-the-facebook-pixel#:~:text=Putting%20it%20simply%2C%20the%20Meta,all%20from%20a%20single%20snippet. (last visited Jan. 6, 2026).

[27] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Jan. 6, 2026).

advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[28]

52.    The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location and finding the people who are most likely to take action and view content.[29]

53.    Once implemented on a website, the Facebook Pixel begins to share users' information the moment a user lands on the website.

54.    When a Facebook user logs onto Facebook, tracking cookies, including the c_user cookie, the data cookie, and the fr cookie, are automatically created and stored on the user's device.[30] These cookies allow Facebook to link the data it receives through the Facebook Pixel to individual Facebook users.

55.    The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.



*Figure 10 – Sample c_user cookie, containing FID of test account created by Plaintiffs' counsel to investigate the Facebook Pixel*

56.    The FID can simply be appended to www.facebookcom/ to navigate to the user's profile (e.g., www.facebook.com/[FID]). Using the FID from *Figure 6*, appending it to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) will redirect the webpage straight to the Facebook profile associated with the UID, as depicted below:

---

[28] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Jan. 6, 2026).

[29] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Jan. 6, 2026).

[30] *Cookies Policy: What are cookies, and what does this policy cover*?, FACEBOOK (Dec. 12, 2023), https://www.facebook.com/policy/cookies/ (last visited Jan. 6, 2026).



*Figure 11 – Sample Facebook account created by Plaintiffs' counsel to investigate the Facebook Pixel, with FID highlighted in URL*

57.     The Pixel tracks user-activity on web pages by monitoring events,[31] which when triggered, causes the Pixel to automatically send data – here, users' sensitive information – directly to Facebook.[32] Examples of events utilized by websites include: (i) a user loading a page with a Pixel installed (the "PageView event");[33] (ii) when a user views pre-designated content, like products for sale (the "ViewContent" event);[34] (iii)

---

[31]     *About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Jan. 6, 2026).

[32] *See generally id.*

[33]     *Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Jan. 6, 2026).

[34]     *Reference: standard events*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/reference/ (last visited Jan. 6, 2026).

CLASS ACTION COMPLAINT

when a user clicks a pre-designated button (the "SubscribedButtonClick" event); and, (iv) the "InitiateCheckout" event (collectively with PageView event, ViewContent event, and SubscribedButtonClick event, the "Pixel Events").[35] The Website utilizes all four Pixel Events.[36]

58.      Defendant's use of the Pixel also transmits its unique Pixel ID via the "id" parameter, which contains Defendant's Pixel ID of "753271888053840."

59.      Defendant uses the Facebook Pixel to monetize its Website users' Sensitive Information.

60.      Facebook independently benefits from the data collected through the Facebook Pixel by using the harvested data to sell targeted advertising services. Through the use of users' private information, Facebook refines its marketing algorithms, profiting from the ability to more accurately target potential customers.

61.      Defendant's use of the Facebook Pixel on the Website is demonstrated by the screenshots below, which follow a user's journey to purchasing the sample product from *Figure 9*.

---

[35] *Id.*

[36] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Jan. 6, 2026).

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13



*Figure 12 – Facebook Pixel tracking a user landing on the webpage from Figure 9 through the "PageView" event*

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Figure 13 – Facebook Pixel tracking a user viewing the product from Figure 9 through the "ViewContent" event*

**CLASS ACTION COMPLAINT**



*Figure 14 – Facebook Pixel tracking a user's click choices when navigating to the sample webpage from Figure 9 through the "SubscribedButtonClick" event*

CLASS ACTION COMPLAINT



*Figure 15 – Facebook Pixel tracking a user's click choices when navigating to the sample webpage from Figure 9 through the "Initiate Checkout" event*

62.    When a business applies with Facebook to use the Facebook Pixel, it is provided with detail about its functionality, including with respect to private information.[37]

63.    To make use of the Facebook Pixel, Defendant agreed to Facebook's Business Tool Terms (the "Facebook Terms").

64.    The Facebook Terms informs website owners using Facebook's Pixel that the employment of the Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event information and contact information.[38]

---

[37] *See Get Started*, META, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Jan. 6, 2026) (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data . . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").

[38] *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Jan. 6, 2026).

65.    The Facebook Terms are transparent that Meta will use the Pixel Event information and contact information "to match the contact information against user IDs, as well as to combine those user IDs with corresponding [Pixel Event information]."[39]

66.    Facebook directs parties implementing the Facebook Pixel—here, Defendant—to encrypt request information[40] *before* data can be shared.[41]

67.    Facebook further provides Facebook Pixel users, such as Defendant, guidance on responsible data handling, and details how data is acquired, used, and stored, including which information is shared with Facebook.

68.    Facebook educates or reminds Facebook Pixel users of their responsibility to inform their users of their website's data sharing, and specifically guides website owners to obtain the requisite rights, permissions, or consents, before sharing information with any third-party.[42]

69.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Facebook Pixel, and ignored Facebook's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

### 2.    *The Reddit Pixel*

70.    Additionally, Defendant has installed a tracking pixel on its Website created by social media platform, Reddit (the "Reddit Pixel").

---

[39] *Id.*

[40] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Facebook Pixel method which makes users' information visible. *See id.*

[41] *Id.*

[42] *Best practices for privacy and data use for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Jan. 6, 2026).

CLASS ACTION COMPLAINT

71.     The Reddit Pixel is a piece of code that can be added to a website by a website owner to track visitors on the website and record the actions the visitors take.[43] The harvested data is subsequently used by the website owner to serve targeted ads to website visitors on Reddit.

72.     The Reddit Pixel is also used in conjunction with Reddit's Conversion API to track specific actions that visitors take on the websites ("events"), such as viewing a page, submitting a search in the website's search bar, adding a product to the visitor's cart, checking out, and other specified events.[44]

73.     Reddit makes use of a website owner's pixel ID to determine which data should be tracked when sending the code for the Pixel to the user's browser,[45] and to specify "which business account should receive" the user's tracking data.[46]

74.     In Defendant's use of the Reddit Pixel, Defendant configured the Reddit Pixel to include a parameter called "id" which identifies Defendant's Reddit Pixel ID as "a2_hy8hf63ygf1x". This data is sent both when receiving communications from the Website and as users send communications to the Website.

75.     Reddit uses this data to help advertisers, including Defendant, gauge the effectiveness of their ad campaigns, improve their ability to attribute activity to specific

---

[43] *About the Reddit Pixel*, REDDIT, https://business.reddithelp.com/s/article/reddit-pixel (last visited Jan. 6, 2026); *Install the Reddit Pixel Directly*, REDDIT, https://business.reddithelp.com/s/article/Install-the-Reddit-Pixel-on-your-website (last visited Jan. 6, 2026).

[44] *Conversion Events*, REDDIT, https://business.reddithelp.com/articles/Knowledge/supported-conversion-events (last visited Jan. 6, 2026).

[45] *See Install the Reddit Pixel Directly*, REDDIT, https://business.reddithelp.com/s/article/Install-the-Reddit-Pixel-on-your-website (last visited Jan. 6, 2026).

[46] *About the Reddit Pixel*, REDDIT, https://business.reddithelp.com/s/article/reddit-pixel (last visited Jan. 6, 2026).

ad campaigns, track visitors across devices, and help them create more precisely targeted ad campaigns.[47]

76.    Additionally, Reddit employs this data to optimize their own ad placements and to develop new services.[48]

77.    Defendant's use of the Reddit Pixel on the Website is demonstrated by the screenshots below, which follow a user's journey to searching for and purchasing a product on the Website.



*Figure 16 – Reddit Pixel tracking a user visiting the webpage from Figure 9 through the "PageVisit" event*



*Figure 17 – Reddit Pixel tracking a user adding the product from Figure 9 to their cart through the "AddToCart" event*

78.    To utilize the Reddit Pixel, Defendant agreed to Reddit's Business Tool Terms (the "Reddit Terms").

---

[47] *Id.*

[48]    *Reddit Privacy Policy*, REDDIT (Aug. 16, 2024), https://www.reddit.com/policies/privacy-policy#policy-h2-4 (last visited Jan. 6, 2026).

CLASS ACTION COMPLAINT

79.    The Reddit Terms informs website owners, such as Defendant, that the employment of the Reddit Pixel will result in data sharing, including with Reddit, of users' website actions, email addresses, cookie IDs, and device IDs, among other "matching parameters."[49]

80.    The Reddit Terms make clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with TikTok.

81.    The Reddit Terms explicitly conditions the use of the Reddit Pixel on website owners' warranties that they: (i) provide "prominent and legally-sufficient notice" of the Reddit Pixel's data sharing to users; (ii) provide "clear, prominent and legally sufficient instructions regarding how to opt out of data collection and use of such data collection and use;" and (iii) do not share "any data related to users who have not provided consent[.]"[50]

82.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Reddit Pixel, and ignored Reddit's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

### 3.    *Google Tracking Tools*

83.    Google offers a range of advertising products, each serving a distinct function within advertising portfolios.

---

[49] *Reddit Business Tool Terms*, REDDIT (Jan. 1, 2025), https://business.reddithelp.com/s/article/Reddit-Business-Tool-Terms (last visited Jan. 6, 2026).

[50] *Id.*

### a.    *Google Ads*

84.    Google Ads, formerly AdWords, is an advertising platform developed by Google that allows advertisers to bid to display advertisements, service offerings, product listings, or videos to web users.[51]

85.    The process advertisers using Google Ads to display ads within text-based search results is as follows: (i) advertisers create text-based ads with a title, description, and a link to the website to place within the Google search results; (ii) advertisers then choose keywords, usually related to their business or target audience, intended to trigger their ads to appear within the user's search results;[52] (iii) Google then allows advertisers to bid on those various keywords;[53] (iv) the advertiser with the highest bid wins the auction, and the ad is displayed on the search results page; and (v) the winning ad appears above or below the organic search results and is marked as an ad.

86.    Google AdSense works in conjunction with the Google Ads bidding system and allows website owners to display Google Ads on their websites and earn a revenue share when ads are viewed or clicked.[54] The search terms bid on through Google Ads are used by website owners participating in Google AdSense, allowing those owners to share in advertising revenue generated by Google.

87.    AdSense for content or AdSense for search are methods by which AdSense functions.[55] In either configuration, AdSense matches advertisements to website users based on the content of the website and user activity.

---

[51]*Achieve all your goals in one place*, GOOGLE ADS, https://ads.google.com/home/goals/ (last visited Jan. 6, 2026).
[52]    *Reach the right people with Search ads*, GOOGLE ADS, https://ads.google.com/home/campaigns/search-ads/ (last visited Jan. 6, 2026).
[53] *Id.*
[54] *Home*, GOOGLE ADSENSE, https://www.google.com/adsense/start/how-it-works/ (last visited Jan. 6, 2026).
[55]    *AdSense revenue share*, GOOGLE ADSENSE HELP, https://support.google.com/adsense/answer/180195?hl=en (last visited Jan. 6, 2026).

88.    Google Ads intercepted Plaintiffs' search terms, as depicted, below, using the sample search "friends-the-complete-series-blu-ray."



*Figure 18 – Test search made on the Website resulted in sharing Search Terms with Google Page Ads*

89.    Google benefits when website owners utilize Google Ads and Google AdSense in connection with their websites.

90.    Through Google AdSense, Google aggregates search data collected from website users. Google uses that data to improve its services and deliver more relevant search results. By analyzing patterns and trends in user behavior, Google gains insight into what users search for and what they are interested in. That insight supports service improvements, product development, and revenue growth.

91.    Google's collection and analysis of search results also allows it to improve its machine learning algorithms.[56] Google uses data on how users interact with search

---

[56] Elle Poole Sidell, *What Does Google Do With Your Data?*, AVAST (Dec. 18, 2020), https://www.avast.com/c-how-google-uses-your-data (last visited Jan. 6, 2026).

CLASS ACTION COMPLAINT

results to train its algorithms to provide more accurate and relevant search results.[57] For example, when a user clicks on a particular search result and spends more time on that page, Google treats that interaction as a signal of relevance to the search query. By aggregating such data across users, Google can develop advertising profiles that include demographic and interest-based attributes, such as age range, industry, and interests.[58]

92.    Google profits in several ways from the Website's use of the Google search engine: (i) advertisers bid and pay Google for the keywords that will result in their ads showing in search results; (ii) through AdSense search, every time a user clicks or views an ad (depending on their chosen method), the advertiser will pay Google for that click or view; (iii) and Google's ability to aggregate user search data allows Google to further tailor its products to advertisers and users by training its algorithms on large volumes of search data.

### b.    *Google Analytics*

93.    Like the Facebook Pixel, Google Analytics ("GA") collects data about user interactions with a website. That data includes link clicks, button clicks, form submissions, conversions, shopping cart abandonment, items added to or removed from carts, file downloads, scrolling behavior, video views, call to action performance, table of contents clicks, and other customizable events.[59]

94.    GA transmits collected interaction data to Google, which associates the activity with the website that generated it.[60] Notably, Google notifies web developers that developers should provide "users with clear and comprehensive information about

---

[57] *Id.*

[58] *Id.*

[59] Zach Paruch, *What Is Google Tag Manager & How Does It Work?*, SEMRUSH BLOG (Jan. 4, 2024) https://www.semrush.com/blog/beginners-guide-to-google-tag-manager/ (last visited Jan. 6, 2026).

[60]    *About the Google tag*, GOOGLE, https://support.google.com/tagmanager/answer/11994839?hl=en (last visited Jan. 6, 2026).

the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[61]

95.    GA functions through specific collection settings and fixed data transmission paths. Google acknowledges the legal implications of those practices and assigns responsibility for user disclosure to website developers, including Defendant.

96.    To use GA the website operators must include the specific Google Tag ID associated with their websites, which allows Google to link the collected data back to their profile on Google products.[62]

97.    Defendant's Google Tag ID is included in transmissions sent to and from users' devices, as seen in *Figure 20*—the HTTP request URL contains the Google Tag ID, listed after "tid=", and referenced as "G-Z225M3JMEW".

98.    Here, Defendant added GA to the Website. That implementation caused Plaintiffs' search terms to be intercepted and transmitted to Google, as shown by the example taken directly from the Website below:

---

[61] *Id.*

[62]    *About    the    Google    Tag* https://support.google.com/tagmanager/answer/11994839?hl=en&ref_topic=14595647 &sjid=11744702880709055388-NA (last visited Jan. 7, 2026).

CLASS ACTION COMPLAINT



*Figure 19 – Test search made on the Website resulted in sharing search terms with Google Analytics*

99.   After the data reaches those common destinations, Google products analyze the information and provide feedback that allows Defendant to monetize the collected data through targeted advertising.

## II.   The Tracking Tools are Trap and Trace and/or Pen Register Devices

100.   California law defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

101.   California law defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

102.   The Tracking Tools are processes to identify the source of electronic communication by capturing incoming electronic impulses and identifying dialing, routing, addressing, and signaling information generated by users, who are never

**CLASS ACTION COMPLAINT**

informed that the website is collaborating with the Tracking Entities to obtain their IP adresses and other identifying information. As such, it is a "trap and trace" device. *See Rodriguez v. Autotrader.com, Inc.*, 762 F. Supp. 3d 921, No. 2:24-cv-08735-RGK-JC, 2025 WL 65409, at *5 (C.D. Cal. Jan. 8, 2025) (Klausner, J.).

103.   The Tracking Tools are "reasonably likely" to identify the source of incoming electronic impulses. In fact, they are designed specifically for that purpose. The IP addresses, detailed URLs, cookies, and Pixel IDs disclosed through the use of the Tracking Tools identify: (i) the source and destination of incoming signals to Plaintiffs' device to the Tracking Entities; and (ii) the source and destination of outgoing signals from Plaintiffs' device.

104.   Defendant did not obtain Plaintiffs' express or implied consent to be subjected to data sharing with the Tracking Tools for the purposes of fingerprinting and de-anonymization.

105.   CIPA imposes civil liability and statutory penalties for the installation of trap and trace software without a court order. California Penal Code § 637.2; *see Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023). No court order to install a trap and trace device via the Tracking Tools was obtained by Defendant.

106.   Defendant did not obtain Plaintiffs' or Class Members' express or implied consent to be subjected to data sharing with the Tracking Entities for the purposes of fingerprinting and de-anonymization, nor did Defendant obtain a court order.

## III.   Defendant Facilitated the Unauthorized Interception of or Access to the Contents of Plaintiffs' Communications.

107.   CIPA § 631(a) prohibits "three distinct and mutually independent patterns of conduct: (1) intentional wiretapping, (2) willfully attempting to learn the contents or meaning of a communication in transit over a wire, and (3) attempting to use or communicate information obtained as a result of engaging in either of the two previous activities." *Rodriguez v. Ford Motor Company*, 722 F. Supp. 3d 1104, 1113 (S.D. Cal. 2024) (citations omitted). Section 631(a)(iv) contains a fourth basis for liability for

anyone "who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the other three bases for liability." *Id.*

108.    The analysis for a violation of CIPA is the same as that under the federal Wiretap Act. *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020).

109.    The Ninth Circuit has held that the "contents" of an online communication under federal wiretap law "refers to the intended message conveyed by the communication, and does not include record information regarding the characteristics of the message that is generated in the course of the communication." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014).

110.    Transmitted URLs that include both the path and the query string concern the intended message, or the substance of a communication. *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 796 (N.D. Cal. 2022).

111.    Here, the network requests intercepted by the Tracking Entities include Request URLs that include the names of the products users browse and/or purchase.

112.    The contents of Plaintiffs' communications with Defendant were intercepted by the Tracking Entities while communicating with Defendant in real time. The Tracking Tools begin intercepting information to the Tracking Entities as soon as the Tracking Tools load onto users' browsers.[63] The Tracking Tools send information to the Tracking Tools contemporaneously with users submitting the information via their browsers.

113.    The interception, duplication, and sending to the Tracking Entities occurred inside Plaintiffs' browser before reaching any destination, therefore occurring while in

---

[63] Mario Neto, *What is the Facebook Pixel – Different ways to collect data to boost your ads performance*, BIRCH BLOG (May 13, 2025), https://bir.ch/blog/what-is-the-facebook-pixel#:~:text=Putting%20it%20simply%2C%20the%20Meta,all%20from%20a%20single%20snippet. (last visited Jan. 6, 2026).

CLASS ACTION COMPLAINT

transit. *See Esparza v. UAG Escondido A1 Inc.,* No.: 23cv0102 DMS(KSC*),* 2024 WL 559241 at *3 (S.D. Cal. Feb. 12, 2024).

114.   The Tracking Entities were third parties to Plaintiffs' communications with Defendant.

115.   Defendant's use of the Tracking Tools enabled the Tracking Entities to intercept Request URLs that specify the content users accessed on webpages on the Website in violation of CIPA.

116.   "[A] conversationalist is betrayed equally by a wiretapper and by the willing conversation participant who surreptitiously allows that third party to wiretap." *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1083 (C.D. Cal. 2021) (citing *Revitch v. New Moosejaw, LLC*, No. 18-cv-06827-VC, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019)).

117.   Defendant did not obtain Plaintiffs' express or implied consent to allow the Tracking Entities to intercept the contents of their communications with the Website.

118.   Defendant and the Tracking Entities benefitted from the interception of Plaintiffs' communications by reading and subsequently using the intercepted communications to build detailed profiles based on Plaintiffs' browsing habits, and using that profile to target Plaintiffs with advertising.[64]

119.   The Tracking Entities independently benefit from the interception of Plaintiffs' communications by using data collected by the Tracking Tools to improve their own products and advertising services, and marketing those advertising capabilities to other potential businesses seeking to market to users, including Plaintiffs.[65]

---

[64] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Jan. 6, 2026).

[65] *See Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Jan. 6, 2026).

CLASS ACTION COMPLAINT

**IV.    Plaintiffs Did Not Consent to be Tracked by Defendant's Use of the Tracking Tools.**

120.    Section 631(a) requires the prior consent of all parties to the communication. *Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107, at *2 (9th Cir. May 31, 2022).

121.    The Tracking Tools actively began to track users before users the moment they arrived on the Website.

122.    Users were, therefore, being tracked as soon as they landed on the Website home page.

123.    "Consent can be [express] or implied, but any consent must be actual." *In re Google, Inc.*, No. 13-MD-02430-LHK, 2013 WL 5423918, at *12 (N.D. Cal. Sept. 26, 2013). Actual consent requires that disclosures "explicitly notify" users of the practices at issue. *See Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1063 (N.D. Cal. 2021).

124.    Defendant's privacy policy tells users that it may engage with data providers who collect information from users and target them with ads through the use of opt out form.[66] But the privacy policy goes on to falsely assure users that these cookies "contain no personally identifiable information."[67]

---

[66] *Slickdeals Privacy Policy*, SLICKDEALS https://corp-site.slickdeals.net/content-list-privacy-policy/ (last visited Jan. 6, 2026).
[67] *Id.*

CLASS ACTION COMPLAINT

125.   Additionally, Defendant's privacy policy fails to disclose the use of several Facebook tracking cookies that allow Facebook to link users to their collected data, including the c_user cookie, the datr cookie,[68] and the fr cookie.[69]

## V.    Defendant's Use of the Tracking Tools Violated the Video Privacy Protection Act (VPPA)

126.   Defendant features both movies and video games in its "Featured Deal Categories" section, curating and providing access to them for consumers.

127.   Defendant earns a commission from every sale resulting from consumers clicking on links on the Website to purchase items, including video content.

128.   Defendant actively solicits deals and sales from partners. Partners, including those selling video content, can pay Defendant to submit their deals to the Website, gain feedback on those deals, including setting pricing, and have those deals advertised on the frontpage of the Website to increase sales.[70] Defendant posts many deals on the Website, including those for prerecored audio visual materials.

129.   Defendant solicits individuals to subscribe to the Website, and Defendant sends subscribers emails advertising deals, including those for prerecored audio visual materials.

---

[68] The datr cookie contains "a unique identifier for [a user's] browser . . . [and] has a lifespan of two years." *Security, site and product integrity*, FACEBOOK, https://www.facebook.com/privacy/policies/cookies/version/cookie_policy_2022/?subpage=subpage-1.2 (last visited Jan. 6, 2026).

[69] The fr cookie contains an encrypted Facebook user ID and browser ID, and has a lifetime of 90 days on a user's device. *See Cookie Policy*, BMW, https://bavarianmotorcars.com/en/cookie-policy (last visited Jan. 6, 2026); *Advertising, recommendations, insights and measurement*, FACEBOOK, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3 (last visited Jan. 6, 2026).

[70] *From Company Ownership to Front Page: Your Top Slickdeals Questions, Answered* https://slickdeals.net/f/18766330-from-company-ownership-to-front-page-your-top-slickdeals-questions-answered (last visited Jan. 8, 2026).

CLASS ACTION COMPLAINT

130.   Defendant, through the Website, engages in the business of providing pre-recorded audio visual materials to Subscribers, including Plaintiffs and the other Class Members, and other users. The Website provides offers to buy videos and video games to Subscribers, including to Plaintiffs and the other Class Members, by advertising discounted videos and video games on the Website and directing users to purchase video materials through partnered retailers.

131.   Plaintiff Cheung purchased four video games by navigating to the webpage for each game on the Website and clicking through links on the Website to purchase each game. All four games purchased by Plaintiff Cheung contained cutscenes, which are precorded audio visual materials under the VPPA. *See Aldana v. GameStop, Inc.*, No. 22-CV-7063-LTS, 2024 WL 708589 at *6 (S.D.N.Y. Feb. 21, 2024).

132.   The four video games, containing cutscenes, purchased by Plaintiff Cheung include: Warhammer 40,000 Space Marine 2,[71][72] Helldivers II,[73] Split Fiction,[74] and Elden Ring.[75]

133.   When consumers engage with Defendant's offers on the Websites, the Tracking Entities discover the identities of consumers through the Tracking Tools, via

---

[71] *See Warhammer 40k Space Marine 2 All Cutscenes (FULL MOVIE)*https://www.youtube.com/watch?v=szWdqPjsSLE (last visited Jan. 15, 2026)

[72] *See Warhammer 40K: Space Marine 2 Ending Cutscene (4K 60FPS)* https://www.ign.com/videos/warhammer-40k-space-marine-2-ending-cutscene-4k-60fps (last visited Jan. 15, 2026).

[73]*See INTRO CINEMATIC - HELLDIVERS™ 2* https://www.youtube.com/watch?v=S9STizATKjE *INTRO CINEMATIC - HELLDIVERS™ 2* https://www.youtube.com/watch?v=S9STizATKjE (last visited Jan. 14, 2026).

[74]*See Split Fiction - All Cutscenes Full Movie (2025)* https://www.youtube.com/watch?v=-4cQ1sCABEI (last visited Jan. 14, 2026).

[75] *See ELDEN RING + Shadow of the Erdtree DLC - All Cinematics & Cutscenes (NO SUBTITLES) [Same Armor]* https://www.youtube.com/watch?v=ATUlTXA2SFY (last visited Jan. 14, 2026).

simple means, like the FID, transmitted to the Tracking Entities along with information identifying the purchased video material.

134.  Defendant does not provide a "distinct and separate" form for users to provide "informed, written consent." 18 U.S.C. § 2710(b)(2)(B)-(B)(i).

## TOLLING

135.  Defendant's conduct tolled the statutes of limitations applicable to Plaintiffs' and the Classes' claims, based on delayed discovery.

136.  Plaintiffs and Class Members did not know, and could not have known, that the Tracking Tools disclosed their information and communications to third parties when they used the Website. Reasonable diligence would not have revealed Defendant's conduct.

137.  Defendant embedded the Tracking Tools into the Website without disclosure, providing no indication that communications would be shared with third parties.

138.  Defendant possessed exclusive knowledge that the Tracking Tools would disclose protected information and confidential communications. Defendant failed to disclose that interacting with the Website would result in disclosure of PII to third parties.

139.  The technical nature of the Tracking Tools prevented the discovery of the full scope of Defendant's conduct. No disclosures or visible indicators alerted a reasonable consumer to interception or disclosure.

140.  Plaintiffs and Class Members first learned of Defendant's conduct through investigation conducted in preparation for this action.

CLASS ACTION COMPLAINT

## CLASS ACTION ALLEGATIONS

141.   Plaintiffs bring this action individually and on behalf of the following Classes:

> **Nationwide Class**: All persons in the United States who visited the Website that had their Sensitive Information improperly disclosed to third parties through the use of the Tracking Tools (the "Class").

> **California Subclass**: All persons in California who visited the Website that had their Sensitive Information improperly disclosed to third parties through the use of the Tracking Tools (the "California Subclass").

> **Subscriber Subclass**: All persons who subscribed to the website that had their personally identifying information improperly disclosed to Meta through the use of the Facebook Pixel (the "Subscriber Subclass")

142.   Specifically excluded from the Classes are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

143.   Plaintiffs reserve the right to amend the Class definitions above if further investigation and/or discovery reveals that the Classes should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

144.   This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

145.   <u>Numerosity (Rule 23(a)(1))</u>: At this time, Plaintiffs do not know the exact number of members of the aforementioned Classes. However, given the popularity of Defendant's Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

146. <u>Typicality of Claims (Rule 23(a)(3))</u>: Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, used the Website and had their Sensitive Information collected and disclosed by Defendant.

147. <u>Adequacy of Representation (Rule 23(a)(4))</u>: Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have no interests antagonistic to, nor in conflict with, the Classes. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

148. <u>Superiority (Rule 23(b)(3))</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class and Subclass Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class and Subclass Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

149. <u>Commonality and Predominance (Rule 23(a)(2), 23(b)(3))</u>: There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include:

   a.    Whether Defendant collected Plaintiffs' and the Class's Sensitive Information;

   b.    Whether Defendant unlawfully disclosed and continues to disclose the Sensitive Information of Users of the Website in violation of CIPA;

   c.    Whether Defendant's disclosures were committed knowingly; and

   d.    Whether Defendant disclosed Plaintiffs' and the Classes' Sensitive Information without consent.

CLASS ACTION COMPLAINT

150.   Information concerning Defendant's Website's data-sharing practices is available from Defendant's or third-party records.

151.   Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

152.   The prosecution of separate actions by individual members of the Classes would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendant. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

153.   Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

154.   Given that Defendant's conduct is ongoing, monetary damages are insufficient, and there is no complete and adequate remedy at law.

### CAUSES OF ACTION

### COUNT I- VIOLATIONS OF THE VIDEO PRIVACY PROTECTION ACT
### 18 U.S.C. § 2710, et seq.
### (On Behalf of Plaintiff Cheung and the Subscriber Subclass)

155.   Plaintiff Cheung hereby incorporates by reference and re-alleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

156.   Plaintiff Cheung brings this count on behalf of himself and all members of the Subscriber subclass.

157.   The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1).

158.   The VPPA also prohibits direct marketers from using disclosed titles and descriptions of videos to market goods and services directly to consumers. 18 U.S.C. § 2710(b)(2)(D)(ii).

159.  "Personally-identifiable information" (PII) is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

160.  A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

161.  Defendant violated this statute by knowingly disclosing Plaintiff Cheung's and other Subscriber Class Members' personally identifiable information to the Tracking Entities, including Meta.

162.  Defendant is a "video tape service provider" because it curates, provides access to, and delivers thousands of prerecored audio visual materialson the Website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

163.  Defendant earns a commission from every sale resulting from consumers clicking on links on the Website to purchase items, including video content.

164.  Plaintiff Cheung and members of the Subscriber Class are "consumers" because they subscribe to (by creating an account and/or signing up for newsletters with their email address) Defendant's Website, in addition to purchasing goods offered through the Website. 18 U.S.C. § 2710(a)(1).

165.  Plaintiff and members of the Subscriber Class purchased video materials through links and advertising from the Website.

166.  Defendant disclosed Plaintiff Cheung's and Subscriber Class Members' personally identifiable information to the Tracking Entities, including Facebook. Defendant utilized the Tracking Tools, which forced Plaintiff Cheung's web browser to transmit Plaintiff Cheung's identifying information, like his Facebook ID, along with information identifying Plaintiff Cheung's and Class Members' purchased video materials to the Tracking Entities.

167.   Defendant knowingly disclosed Plaintiff Cheung's and Subscriber Class Members' PII, which is triggered automatically through Defendant's use of the Tracking Tools. No additional steps on the part of the Defendant or the Tracking Entities are required. Once the Tracking Tool's routine exchange of information is complete, the FID that becomes available can be used by any individual to easily identify a Facebook user. *See Section 1* (The Facebook Pixel) (process to identify an individual using FID).

168.   Plaintiff Cheung and members of the Subscriber Class did not provide Defendant with any form of consent, either written or otherwise, to disclose their PII to the Tracking Entities, including Meta. Defendant failed to obtain "informed, written consent" from Subscribers – including Plaintiff Cheung and members of the Subscriber Class – "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner." 18 U.S.C. § 2710(b)(2)(B)(i)-(ii).

169.   Defendant's disclosures of Plaintiff Cheung's and Subscriber Class Members' PII were not made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendant's disclosures to Meta were not necessary for "debt collection activities, order fulfilment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2). Instead, Plaintiff Cheung's and Subscriber Class Members' PII were used for improving marketing effectiveness.

170.   In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(b)(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide an opportunity to opt out as required by the VPPA.

171.   On behalf of himself and the Subscriber Class, Plaintiff Cheung seeks: (i) declaratory relief as to Defendant; (ii) injunctive and equitable relief as is necessary to

protect the interests of Plaintiff Cheung and the Subscriber Class by requiring Defendant to comply with the VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

### COUNT II - VIOLATION OF THE FEDERAL WIRETAP ACT
**18 U.S.C. § 2510, et seq.**
**(On Behalf of Plaintiff Cheung and the Nationwide Class)**

172.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

173.    Plaintiff brings this cause of action on behalf of himself and all Class Members.

174.    The Federal Wiretap Act, codified at 18 U.S.C. § 2510 et seq. (the "Wiretap Act"), prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. 18 U.S.C. § 2511.

175.    The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

176.    The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

177.    The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

178.    The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

179.    The Wiretap Act defines "person" to include any individual, partnership,

association, trust, or corporation. 18 U.S.C. § 2510(6).

180. Defendant is a "person" within the meaning of the Wiretap Act.

181. The Tracking Tools embedded on Defendant's Website constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

182. Plaintiff had a reasonable expectation of privacy in his electronic communications with Defendant's Website, including his searches, browsing activity, and order-related interactions..

183. A reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting users' choices, intent, and behavior on a commercial website are sensitive. Such communications include searches, menu selections, and order interactions. They convey the substance and meaning of the communication.

184. Plaintiff, as a reasonable user, is entitled to assume that disclosure of the contents of his communications occurs lawfully and with consent. The opposite assumption would require users to expect routine violations of their privacy.

185. Plaintiff reasonably expected that Tracking Entities were not intercepting, recording, or using the contents of his electronic communications with Defendant's Website.

186. During the relevant time period, Plaintiff's electronic communications with the Website were intercepted at the moment they were sent and transmitted to Tracking Entities without Plaintiff's consent. The intercepted information was monetized. Defendant combined that information with data collected about Plaintiff across the internet and used it for advertising, analytics, and marketing optimization.

187. Interception occurred whenever Plaintiff interacted with the Website, including when he navigated webpages, used search or location features, viewed menu items, initiated an order, or otherwise communicated information to the Website through his browser.

CLASS ACTION COMPLAINT

188.  At all relevant times, Defendant acted knowingly, wilfully, and intentionally. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on the Website and understood that doing so would result in the interception and transmission of users' communications to Tracking Entities.

189.  Plaintiff was not asked to consent to the interception, recording, disclosure, or use of his electronic communications with the Website by the Tracking Entities. Plaintiff instead affirmatively declined non-essential tracking through Defendant's Your Privacy Choices interface.

190.  The unauthorized interception and use of Plaintiff's electronic communications by the Tracking Entities was only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a).

191.  As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiff has been damaged and is entitled to relief under 18 U.S.C. § 2520, including:

a.  damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiff and any profits made by the intercepting parties as a result of the violations, or

b.  statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

c.  reasonable attorneys' fees and costs.

CLASS ACTION COMPLAINT

## COUNT III - VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
## Cal. Penal Code § 631
### (On Behalf of Plaintiff Harris and the California Subclass)

192.   Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

193.   Plaintiff brings this count on behalf of herself and all members of the California Subclass.

194.   CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

195.   The Ninth Circuit confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020). With respect to CIPA, the California Supreme Court has similarly concluded that the statute is intended to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the

communication. *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985); *see Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

196.    The Website, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

197.    Within the relevant time period, Plaintiff and members of the California Subclass communicated browsing history to Defendant, with the expectation of receiving video content provided by Defendant.

198.    During the relevant time period, Defendant acted without the consent of all parties to the communication. Defendant wilfully read, or attempted to read or learn, the contents or meaning of Plaintiff's and California Subclass Members' electronic communications. The interception occurred contemporaneously with the communications' transit over wire, line, or cable. The communications were sent from or received at locations within California.

199.    The information collected by the Tracking Tools was not for the sole benefit of Defendant.

200.    Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to intercept, collect, and disclose electronic communications in violation of CIPA § 631.

201.    Plaintiff and members of the California Subclass did not authorize or consent to the tracking, interception, and collection of any of their electronic communications.

202.    The violation of section 631 constitutes an invasion of privacy sufficient to confer Article III standing.

## COUNT IV - VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 638.51
### (On Behalf of Plaintiff Harris and the California Subclass)

203.   Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

204.   Plaintiff brings this count on behalf of herself and all members of the California Subclass.

205.   Under CIPA Section 638, a person "may not install or use a pen register or a trap and trace device without first obtaining a court order . . . ." Cal. Penal Code § 638.51.

206.   A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." California Penal Code § 638.50(b).[76]

207.   A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." California Penal Code § 638.50(c).

208.   "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *Greenley v. Kochava, Inc.*, 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023).

209.   Given CIPA's purpose to protect Californians' privacy, "it seems very unlikely that the state Legislature meant to permit the installation and implementation of pen registers 'so long as those devices also record the contents of third parties'

---

[76] *Id.* § 638.50(b).

communications.'" *Gabrielli v. Haleon US Inc.*, No. 25-cv-02555-WHO, 2025 U.S. Dist. LEXIS 169503, at *34 (N.D. Cal. Aug. 29, 2025).

210.   California Penal Code § 638.51 provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order…" § 638.51(a). No court order to install pen register or trap and trace devices via the Tracking Tools was obtained by Defendant.

211.   Defendant deploys the Tracking Tools on the Website and thereby uses pen register and trap and trace processes. The Tracking Tools capture IP adresses, email addresses, routing, addressing, and other signaling information of Website visitors. The Tracking Tools identify the source of incoming electronic and wire communications to the Website.

212.   Defendant was not authorized by any court order to use pen register and trap and trace devices to track Plaintiff's and California Subclass Members' Sensitive Information.

213.   Defendant did not obtain consent from Plaintiff and Class Members before using pen register or trap and trace technology to identify users of its Website, and has violated Section 638.51.

214.   As a direct and proximate result of Defendant's conduct, Plaintiff's and California Subclass Members suffered losses and were damaged in an amount to be determined at trial.

## COUNT V- VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL")
### (On Behalf of Plaintiff Harris and the California Subclass)

215.   Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

216.   The UCL prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

217.   By actively and purposefully installing a wiretap without a visitor's consent in violation of the Federal Wiretap Act and CIPA, Defendant has violated the unlawful prong of the UCL.

218.   By actively and purposefully installing a pen register and trap and trace device without a visitor's consent in violation of CIPA, Defendant has violated the unlawful prong of the UCL.

219.   Defendant failed to disclose the presence of the Tracking Tools on the Website. Defendant disclosed visitors' Sensitive Information without knowledge or consent. Defendant exposed users' information to Tracking Entities to build personal profiles without knowledge or consent. Defendant failed to disclose that it was wiretapping visitors' communications with the Website. Through this conduct, Defendant violated the unfair prong of the UCL.

220.   Plaintiff has standing to bring claims against Defendant under the UCL. Plaintiff's information was tracked and recorded without consent. Plaintiff's data was used to build personal profiles for advertising purposes without consent.

221.   Plaintiff would have considered it important to the decision to visit Defendant's Website to know that her data was being tracked and recorded without her consent.

222.   Because of Defendant's UCL violations described above, Plaintiff suffered injury by losing control of her personal data and having her personal information tracked and recorded without her consent.

223.   As a direct and proximate result of Defendant's conduct, Plaintiff and California Subclass Members suffered losses and were damaged in an amount to be determined at trial.

CLASS ACTION COMPLAINT

## COUNT VI - UNJUST ENRICHMENT
### (On behalf of Plaintiffs and All Class Members)

224.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in all preceding paragraphs of this Complaint.

225.   Plaintiffs bring this cause of action on behalf of themselves and all Class Members.

226.   Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiffs' and Class Members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

227.   Defendant retained those benefits under circumstances in which the information was collected and transmitted without valid consent. The information was collected and transmitted in breach of Defendant's representations to users. Defendant's retention of those benefits is unjust.

228.   Plaintiffs and Class Members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiffs and the Class. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiffs and Class Members are entitled to the relief set forth below

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

1.   For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Classes and their counsel as Class Counsel;

2.   For an order declaring the Defendant's conduct violates the statutes referenced herein;

3.   For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

4.   Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website users;

5.   An award of statutory damages or penalties to the extent available;

6.   For damages in amounts to be determined by the Court and/or jury;

7.   For pre-judgment interest on all amounts awarded;

8.   For an order of restitution and all other forms of monetary relief;

9.   An award of all reasonable attorneys' fees and costs; and

10.  Such other and further relief as the Court deems necessary and appropriate.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs demand a trial by jury of all issues so triable.

DATED: January 16, 2026            Respectfully submitted,

*/s/ Robert Ahdoot*
Robert Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Theodore W. Maya (SBN 223242)
tmaya@ahdootwolfson.com
Yufei Wang (SBN 346170)
ywang@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

Mark S. Reich*
mreich@zlk.com
Christopher V. DeVivo*
cdevivo@zlk.com
Michael N. Pollack*
mpollack@zlk.com
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

*\*pro hac vice* forthcoming

*Attorneys for Plaintiffs and the Proposed Class*

CLASS ACTION COMPLAINT